

FILED
John E. Triplett, Clerk of Court
United States District Court

*By jamesburrell at 6:07 pm, Sep 04, 2025*

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF GEORGIA
# AUGUSTA DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | **INDICTMENT NO:**  1:25cr-62 |
| | ) | |
| **v.** | ) | **18 U.S.C. §§ 1344(2), 1349** |
| | ) | **Conspiracy to Commit Bank** |
| **FNU LNU (FIRST NAME** | ) | **Fraud** |
| **UNKNOWN, LAST NAME** | ) | |
| **UNKNOWN)** | ) | **18 U.S.C. § 1344(2)** |
|     **aka RONY DENIS,** | ) | **Bank Fraud** |
| | ) | |
| **ANTHONY OLOANS,** | ) | **18 U.S.C. §§ 1343, 1349** |
| | ) | **Conspiracy to Commit Wire** |
| **JOSEPH FRYAR,** | ) | **Fraud** |
| | ) | |
| **DENNIS NOSTRANT,** | ) | **18 U.S.C. § 1343** |
| | ) | **Wire Fraud** |
| **GERARD ROBERTSON,** | ) | |
| | ) | **26 U.S.C. § 7206(2)** |
| **DAVID REIP,** | ) | **Aiding and Assisting in the Filing** |
| | ) | **of a False Tax Return** |
| **MARCUS LABAT, and** | ) | |
| | ) | |
| **OMAR GARCIA** | ) | |

**THE GRAND JURY CHARGES THAT:**

## INTRODUCTORY ALLEGATIONS

At all times material to this Indictment:

### *The Defendants*

1.    At least as early as July 29, 1983, **FNU LNU (FIRST NAME UNKNOWN, LAST NAME UNKNOWN)**, stole the identity of "**RONY DENIS.**"

2.    **FNU LNU aka "RONY DENIS"** married a U.S. citizen in 1988.  In 2001, using the stolen identity "**RONY DENIS,**" **FNU LNU** applied for United States citizenship, which was granted in 2002.

3.    Since on or about July 29, 1983, **FNU LNU** has presented himself as "**RONY DENIS**" and his true identify remains unknown.  In this Indictment, he will be referred to as "**DENIS,**" as he has been known since July 29, 1983, and during the time relevant to this Indictment.

4.    **DENIS** resided at various locations including Hinesville, Georgia; Martinez, Georgia; and West Palm Beach, Florida.  **DENIS** was one of the founders of the House of Prayer of Christian Churches of America (hereinafter "HOPCC") and was identified as "Pastor" of HOPCC and "Helper Denis."

5.    Defendant **ANTHONY OLOANS (hereinafter "OLOANS")** resided in Hinesville, Georgia.  **OLOANS** was the "Executive Assistant to **DENIS.**"

6.    Defendant **JOSEPH T. FRYAR (hereinafter "FRYAR")** resided at various locations including Hinesville, Georgia and Martinez, Georgia.  **FRYAR** was a "volunteer minister" at the HOPCC.

7.    Defendant **DENNIS NOSTRANT (hereinafter "NOSTRANT")** resided in Hinesville, Georgia.  **NOSTRANT** acted as a bookkeeper for various entities associated with the HOPCC and was a "volunteer minister" at the HOPCC located in Hinesville, Georgia.

8.    Defendant **GERARD ROBERTSON (hereinafter "ROBERTSON")** resided in Hinesville, Georgia.  **ROBERTSON** held positions as the "director," and the Chief Executive Officer of the House of Prayer Bible Seminary (hereinafter "HOPBS") located in Hinesville, Georgia.  **ROBERTSON** was also a "volunteer minister" at the HOPCC.

2

9.    Defendant **DAVID REIP (hereinafter "REIP")** resided in Hinesville, Georgia.  REIP was a "volunteer minister" at the HOPCC.

10.    Defendant **MARCUS LABAT (hereinafter "LABAT")** resided at various times in Hinesville, Georgia.  **LABAT** was the "Controller" and a "School Certifying Official" at HOPBS, and a "volunteer minister" at the HOPCC.

11.    Defendant **OMAR GARCIA (hereinafter "GARCIA")** resided at various times in Hinesville, Georgia.  **GARCIA** was a "School Certifying Official" for the HOPBS.  **GARCIA** was also identified as "registrar" of the HOPBS and "volunteer minister" at the HOPCC.

*Establishment of House of Prayer Christian Churches,*
*Its entities, and Its Leadership*

12.    Prior to 2004, **DENIS** recruited several members of the New Testament Christian Church to form a new organization which became the HOPCC.

13.    **DENIS** and his followers established HOPCC sites in approximately 10-12 locations in at least five states.  The largest congregation was in Hinesville, Georgia and had an average of approximately 200-300 attendees.  Some congregations were as small as a few dozen.

14.    Two of the locations were in the Southern District of Georgia - one in Hinesville, Georgia, and one in Hephzibah[1], Georgia.

---

[1] The HOPCC organization in Hephzibah was at some point renamed "The Assembly of Prayer Christian Church," but will be referred to by its former name, HOPCC, in this Indictment.

3

15.     Many of the HOPCC locations were established near United States military installations for easier recruitment and indoctrination of military members.

16.     **DENIS** established HOPCC headquarters in Hinesville, Georgia, and maintained a core group of supporters at all times, which included, among others, **OLOANS**, **FRYAR**, **NOSTRANT**, **ROBERTSON**, **REIP**, **GARCIA**, and **LABAT**.

17.     Along with establishment of the HOPCC, entities identified as "bible seminaries" were set up in five locations.  The five locations for the HOPBS were Hinesville, Georgia; Hephzibah, Georgia; Fayetteville, North Carolina; Killeen, Texas; and Tacoma, Washington.

18.     At times the Defendants received funds from bank accounts of the HOPCC and HOPBS which were classified using various terms including: "expense reimbursement" "ministerial love offering," "love offering," "automotive reimbursement," "expense reimbursement & offering" or "building fund."

19.     Living expenses were at times paid using American Express Accounts opened in the name of an individual identified herein as "M.D." **DENIS**, **OLOANS**, **FRYAR**, **NOSTRANT**, **ROBERTSON**, and **LABAT** were authorized users on one or more of these accounts.

20.     **DENIS**, **OLOANS**, **FRYAR**, **NOSTRANT**, **ROBERTSON**, **REIP**, **GARCIA**, and **LABAT** exercised extreme control and manipulation over other members of the HOPCC and attendees of the HOPBS.

21.     As part of the control and manipulation, some HOPCC members were directed by the leadership to attend the bible seminaries and use their military

4

benefits to pay for attending.    **ROBERTSON**, **GARCIA**, and **LABAT** each participated in various operations of those seminars.

22.    As part of the control and manipulation, **OLOANS** maintained dozens of HOPCC members' personally identifiable information, including driver's licenses and Social Security numbers to use for the Defendants' benefit.

23.    As part of the control and manipulation, the Defendants had some members sign Non-Disclosure Agreements.

24.    As part of the control and manipulation, **DENIS** at times arranged marriages and orchestrated divorces among HOPCC members.

25.    As part of the control and manipulation, **DENIS** and **OLOANS** directed HOPCC members to live in rental properties, which were purchased using straw buyers which generated rental income that flowed to the Defendants.

26.    As part of the control and manipulation, HOPCC members were expected to attend the organization's gatherings and meetings on a virtual daily basis and were expected to receive permission from a person in authority, to include **DENIS** and **ROBERTSON**, to be absent from these gatherings and meetings.

27.    As part of the control and manipulation, HOPCC members were directed by the church leadership to recruit military personnel to join HOPCC using a technique called "soul winning."

28.    As part of the control and manipulation, HOPCC members were expected to report infractions and violations of established rules to HOPCC

leadership, which included **DENIS**, **OLOANS**, **FRYAR**, **NOSTRANT**, **ROBERTSON**, **REIP**, **GARCIA**, and **LABAT**.

29.    As part of the control and manipulation, HOPBS students would be "counseled" in writing for infractions of "Student Conduct," to include such things as texting a person of the opposite gender; wearing "worldly and unbecoming" attire; "insubordination;" "Defiance;" and "Sewing Discord and sedition."

30.    As part of the control and manipulation, **DENIS** castigated and humiliated congregants both in private and in front of other members of the HOPCC for purported violations of the expected standards of conduct.

31.    As part of the control and manipulation, HOPCC members were expected not to have contact with former members, including family.  Some former member names were maintained on a list entitled "Ex-HOPCC Traitors."

6

## THE BANK FRAUD SCHEME

### COUNT ONE
*Conspiracy to Commit Bank Fraud*
18 U.S.C. §§ 1344(2) and 1349

32.   Paragraphs 1 through 31 of this Indictment are hereby realleged and incorporated herein as though set forth fully herein.

33.   Beginning on a date unknown to the Grand Jury, but as early as 2004 and continuing through the date of this Indictment, the exact dates being unknown, in the Southern District of Georgia, and elsewhere, the Defendants

**FNU LNU aka RONY DENIS,**

**ANTHONY OLOANS,**

**JOSEPH FRYAR,**

**DENNIS NOSTRANT,**

**GERARD ROBERTSON**, and

**DAVID REIP**

and other conspirators known and unknown, did knowingly combine, conspire, confederate, and agree with each other and others known and unknown, to commit bank fraud, that is, to knowingly execute and attempt to execute the below scheme and artifice to defraud, and to obtain money, funds, assets, securities, and other property owned by and under the custody and control of, financial institutions as defined under Title 18, United States Code, Section 20, by means of materially false and fraudulent pretenses, representations and promises, in violation of Title 18 United States Code, Section 1344(2).

7

<u>Object of the Conspiracy</u>

34.    The object of the scheme and artifice to defraud was for the Defendants and their co-conspirators to unlawfully enrich themselves by fraudulently obtaining funds, money and property under the custody and control of financial institutions by making materially false representations.

<u>Manner and Means</u>

35.    The manner and means utilized by the Defendants to accomplish the object of the scheme and artifice to defraud included, but were not limited to, the following:

36.    **DENIS** and **OLOANS** would direct members of the HOPCC to act as "straw buyers" in residential real estate transactions to conceal the true buyers' identities.

37.    These transactions were not arms-length transactions and involved **DENIS**, **OLOANS**, **FRYAR**, **NOSTRANT**, **ROBERTSON**, and **REIP** as buyers, sellers, notaries, or Powers of Attorney (hereinafter "POAs") in the transactions.

38.    The straw buyers would be required to execute loan documents which the Defendants knew contained false information to obtain mortgages from financial institutions for the purchase of these properties.

39.    After the closings, the Defendants would seize control of the properties and convert them into rental properties.

40.    The Defendants would direct other members of the HPOCC to live in the properties and would collect rent.

8

41.    The mortgages obtained in the names of the straw buyers would be paid using bank accounts in the names of Governor's Management, LLC; Centex Management, LLC; Centex Services, LLC; and Prudential Realty, LLC; among others, which were controlled by **OLOANS**, **NOSTRANT**, and **REIP** and sometimes a combination of these Defendants.

42.    **OLOANS** would create POAs, which would be used by the Defendants to buy, sell, and transfer properties that had been purchased using the straw buyers. **OLOANS** sometimes maintained these POAs for years, for future use.

43.    **OLOANS**, **NOSTRANT**, **FRYAR**, **REIP**, and **ROBERTSON** would also create *fraudulent* POAs, by forging signatures and falsely notarizing the same, which were then used to buy, sell, and transfer properties that had been purchased using the straw buyers.

44.    The Defendants would establish Limited Liability Corporations (hereinafter "LLCs") after which they would transfer properties into them using POAs and quit claim deeds.  Some of these transfers were unknown to and unauthorized by the mortgage lender.  The Defendants intended to conceal ownership of the properties by using LLCs.  Members or Registered Agents of the LLCs used for this purpose included **OLOANS**, **NOSTRANT**, and **FRYAR**.

45.    At times, after the initial mortgage loan, **OLOANS** would impersonate straw buyers to induce lenders to grant loan modifications or forbearance.

9

46.    In some instances, the Defendants allowed the mortgages held in the names of the straw buyers to go into default or foreclosure, thereby harming the straw buyer's credit.

47.    Between 2018 and 2020, the Defendants collected rent payments totaling over $5,200,000. These payments were deposited primarily into accounts for Governor's Management, LLC and The Prudential Realty, LLC.

48.    Records of the Georgia Secretary of State show that Governor's Management, LLC was a Georgia corporation established in or about 2010. Other records show that Governor's Management, LLC was later identified as a "real estate holding company" and lists the email contact of fls2265@gmail.com, which was used by **OLOANS** and Post Office Box 515 Allenhurst, Georgia, which was opened by **FRYAR**, in or about 2011.

49.    Records of the Georgia Secretary of State show that The Prudential Realty, LLC was a Georgia corporation established in or about 2017. **FRYAR** was listed as a member of the LLC, and the email contact for The Prudential Realty, LLC was joseph_fryar@yahoo.com.

50.    The rental income was used to advance the object of the conspiracy, including, but not limited to, at times paying mortgages on some of the other rental properties; at times paying the mortgages on **DENIS**' homes in West Palm Beach, Florida and Martinez, Georgia; and at times paying credit card bills for the Defendants.

10

Acts in Furtherance of the Scheme

51.    In furtherance of the conspiracy and to effectuate the object thereof, the Defendants committed the below-listed acts, among others:

*Straw Purchase of 808 Spanish Oak Drive, Hinesville, Georgia*

52.    On or about June 6, 2008, HOPCC member A.S. purchased 808 Spanish Oak Drive, Hinesville, Georgia for $86,000.

53.    Approximately two months later, on or about August 18, 2008, A.S. sold 808 Spanish Oak Drive, Hinesville, Georgia to straw buyer then-HOPCC-member (identified hereinafter as "J.E.") for $115,000.

54.    Prior to the closing on August 18, 2008, **DENIS** instructed J.E. to appear at an attorney's office on August 18, 2008, for a real estate closing.  J.E. knew she was expected to sign closing documents, including mortgage loan documents, for a property whose address was then unknown to her.

55.    A.S. was not present at the closing and had another HOPCC member (identified hereinafter as "J.R.") act as his POA for the closing.  J.R. and J.E. pretended that they did not know one another.

56.    As previously instructed by **DENIS**, J.E. signed the paperwork for the closing on 808 Spanish Oak Drive, Hinesville, Georgia as a straw buyer.

57.    J.E. was not employed and did not earn an income and brought no funds for a downpayment.

58.    J.E never lived at 808 Spanish Oak Drive, Hinesville, Georgia.

59.    J.E. never paid the mortgage for 808 Spanish Oak Drive, Hinesville,

11

Georgia.

60.     J.E. never collected or received any rental income from 808 Spanish Oak Drive, Hinesville, Georgia.

61.     At some point, J.E. was asked to sign her name on a blank piece of paper and was told it would be used to produce a "ministerial license."

62.     The Bank of America Mortgage was paid at times using a Governor's Management, LLC account at Cadence Bank (formerly known as State Bank - account ending in 4048) whose signatories included **NOSTRANT** and **REIP**.

63.     On Thanksgiving Day, November 26, 2020, J.E. and her husband left the HOPCC and escaped to another state.

64.     On Monday, November 30, 2020, using a POA containing the signature of J.E., **OLOANS** transferred ownership of 808 Spanish Oak Lane, Hinesville, Georgia to Centex Management, LLC, of which **OLOANS** was a member.

*Straw Purchase of 1374 Forest Lake Drive, Hinesville, Georgia*

65.     On March 28, 2008, **OLOANS** purchased 1374 Forest Lake Drive, Hinesville, Georgia for $56,500.

66.     On August 4, 2008, a Bank of America employee completed a telephonic interview of a person she believed to be J.R., a former HOPCC member, for the purpose of completing a Uniform Residential Loan Application (hereinafter "Application") for the purchase of 1374 Forest Lake Drive, Hinesville, Georgia.

67.     J.R. was not the person who completed the telephonic interview on August 4, 2008.

12

68.    The Application falsely represented, among other things, that J.R. had a monthly income of $4,435.00, when in truth and in fact, J.R. did not work and had no income.

69.    **OLOANS** directed J.R. to appear on August 22, 2008, at an attorney's office to act as a straw-buyer for the purchase of 1374 Forest Lake Drive, Hinesville, Georgia.

70.    **OLOANS** was listed as the seller and the sale price was $105,000.

71.    J.R. never lived at 1374 Forest Lake Drive, Hinesville, Georgia.

72.    J.R. never paid the mortgage for 1374 Forest Lake Drive, Hinesville, Georgia.

73.    J.R. never collected or received any rental income from 1374 Forest Lake Drive, Hinesville, Georgia.

74.    On September 1, 2016, J.R. and her husband left the HOPCC.

75.    On or about September 8, 2016, unbeknownst to J.R. a quitclaim deed was filed transferring 1374 Forest Lake Drive, Hinesville, Georgia to Centex Management, LLC, of which **OLOANS**, the original seller of the property, was a member.

76.    The lending institution still had J.R. listed as the party responsible for the loan.

77.    On January 2, 2018, the financial institution foreclosed on 1374 Forest Lake Drive, Hinesville, Georgia, which the financial institution's records inaccurately indicated was owned by J.R., rather than in the name of Centex Management, LCC.

13

*Straw Purchase of 707 Madison Drive, Hinesville, Georgia*

78.    On or about November 10, 2005, **DENIS** purchased 707 Madison Drive, Hinesville, Georgia for $82,000.

79.    Approximately three months later, on or about February 1, 2006, **DENIS**, with **OLOANS** acting under a POA for **DENIS** sold 707 Madison Drive, Hinesville, Georgia for $122,000.

80.    In the sales contract, O.M., another HOPCC member, was listed as the buyer.

81.    O.M. was unaware of the transaction.

82.    On or about February 1, 2006, **REIP**, using a bogus and forged POA of O.M., signed loan documents for the purchase of 707 Madison Drive, Hinesville, Georgia.  **REIP** purported to be O.M.'s attorney in fact, when O.M. had not given **REIP** such authority and did not even know the property had been purchased using his name.

83.    O.M. never lived at 707 Madison Drive, Hinesville, Georgia.

84.    O.M never paid the mortgage for 707 Madison Drive, Hinesville, Georgia.

85.    O.M. never collected or received any rental income from 707 Madison Drive, Hinesville, Georgia.

*Straw Purchase of 801 Krebs Lane, Hinesville, Georgia*

86.    On or about November 11, 2013, **FRYAR** purchased 801 Krebs Lane, Hinesville, Georgia for $30,000.

14

87.     Approximately one month later, on or about December 13, 2013, a sales contract for 801 Krebs Lane, Hinesville, Georgia was executed.   The contract represents that the buyer was then-HOPCC- member (identified herein as "D.C.") when in truth and in fact, D.C. did not enter into such contract.

88.     The sales price was $103,000.

89.     On or about January 29, 2014, **OLOANS** directed D.C., to travel from his home in California to the Southern District of Georgia for the purpose of attending the real estate closing wherein D.C. would act as the buyer of 801 Krebs Lane, Hinesville, Georgia, when in truth and in fact, D.C. was not the actual buyer of the property.

90.     On or about January 30, 2014, **OLOANS** accompanied D.C. to the real estate closing on 801 Krebs Lane, Hinesville, Georgia.   **FRYAR** was present as the seller of this non-arms-length transaction.

91.     Prior to the closing, a fraudulent loan application was submitted to Wells Fargo and purported to have been made by D.C., when in truth and in fact someone other than D.C. submitted the loan application.

92.     On January 27, 2014, as part of the fraudulent loan application, a forged and bogus "gift letter" was submitted to Wells Fargo.   The "gift letter" purported to have been signed by D.C. and J.E. (J.E. is the same person involved in the *808 Spanish Oak transaction* above) when in truth and in fact neither D.C. nor J.E. had signed the letter or even knew of its existence.   Further, the letter identified D.C. as J.E.'s brother, when in truth and in fact they are not related.   Further, the "gift letter"

15

identified J.E.'s phone number as 843-473-0743, which was actually used by **OLOANS**.

93.     The mailing address provided to Wells Fargo for correspondence on the loan was Post Office Box 515, Allenhurst, Georgia. This Post Office Box was opened by the seller, **FRYAR**, in 2011 and listed six other names of people who could access this Post Office Box, none of which were D.C.

94.     D.C. left the HOPCC later in 2014.

95.     D.C. never lived at 801 Krebs Lane, Hinesville, Georgia.

96.     D.C. never paid the mortgage for 801 Krebs Lane, Hinesville, Georgia.

97.     D.C. never collected any rental income from 801 Krebs Lane, Hinesville, Georgia.

98.     During the trip to Hinesville, **OLOANS** directed D.C. sign D.C.'s name on a blank piece of paper.

99.     On or about September 30, 2017, Wells Fargo received correspondence purportedly from D.C. requesting that **OLOANS** be authorized to act on behalf of D.C. with respect to the mortgage on 801 Krebs Lane. D.C. did not send such correspondence nor was he aware of such.

100.    On October 4, 2017, Wells Fargo responded to the letter of September 30, 2017, and indicated that **OLOANS** had been added to the mortgage account and was authorized to receive account information and make limited updates.

101.    By March 22, 2018, the monthly mortgage payments on 801 Krebs Lane were not being regularly made.

102. At that time, **OLOANS** began the process of a loan modification seeking to lower payments, interest rates, or principal to benefit the Defendants.

103. On September 17, 2019, Wells Fargo granted that modification request.

104. The Wells Fargo Mortgage was paid at times using a Governor's Management, LLC account maintained at Cadence Bank (formerly known as State Bank) (account ending in 4048) whose signatories included **NOSTRANT** and **REIP**.

105. The Wells Fargo Mortgage was paid at times using a Governor's Management, LLC account maintained at South Georgia Bank (account ending in 0303) whose signatories included **NOSTRANT** and **REIP**.

106. The Wells Fargo Mortgage was paid at times using Governor's Management, LLC account maintained at Regions Bank (account ending in 4692) whose signatories included **OLOANS**, **NOSTRANT**, and **REIP**.

*Straw Purchase of 1480 Flo Zechman Drive, Hinesville, Georgia*

107. On or about April 17, 2014, **FRYAR** purchased 1480 Flo Zechman Drive, Hinesville, Georgia from the Secretary of Veterans Affairs for $50,000.

108. Approximately two months later, on or about June 19, 2014, **FRYAR** sold 1480 Flo Zechman Drive, Hinesville, Georgia to HOPCC members R.B and his wife P.B. for $110,000.

109. In the mortgage loan application to New American Funding, while the name in the application documents was P.B., the phone number identified as P.B.'s was 843-473-0743, which was used by **OLOANS**.

17

110. Additionally, on or about October 1, 2014, the mailing address for borrower P.B. was changed to Post Office Box 465, Walthourville, Georgia, 31333, which was opened by **REIP** in the name of "Prudential Realty, LLC."

111. On January 15, 2021, R.B. and P.B. transferred 1480 Flo Zechman Drive, Hinesville, by quitclaim deed to Deerwood Point, LLC, whose "principal" is identified as **OLOANS**.

112. Liberty County real estate records indicate that no money was transferred between R.B. and P.B. and Deerwood Point, LLC.

113. At times, the mortgage on 1480 Flo Zechman was paid using funds from a Governor's Management, LLC's bank account ending in 4048, whose signatories included **REIP** and **NOSTRANT**.

114. **DENIS** and **OLOANS** controlled the rental business relating to 1480 Flo Zechman.

All in violation of Title 18 United States Code, Sections 1344(2) and 1349.

18

## COUNT TWO
*Bank Fraud*
18 U.S.C. §§ 1344(2) and 2

115.    The Grand Jury realleges and incorporates by reference Paragraphs 1 through 50 and Paragraphs 86 through 106 above in their entirety as if fully set forth herein.

116.    Beginning in or about December 2013 and continuing until on or about October 18, 2021, in Liberty County, within the Southern District of Georgia, and elsewhere, the Defendants,

**ANTHONY OLOANS,**

**JOSEPH FRYAR,**

**DENNIS NOSTRANT**, and

**DAVID REIP**

aided and abetted by each other and by others known and unknown to the Grand Jury, did knowingly execute a scheme and artifice to defraud, and obtain money and property, owned by, or under the custody or control of Wells Fargo, a financial institution, the deposits of which were then insured by the Federal Deposit Insurance Company, by means of false and fraudulent pretenses, representations, and promises relating to a material fact.

### Execution of the Scheme and Artifice

117.    The scheme and artifice to defraud is described above in Paragraphs 86-106, relating to 801 Krebs Lane, Hinesville, Georgia, with such paragraphs incorporated as if fully set forth herein.

19

118.    Prior to October 4, 2017, Wells Fargo received a written request to allow **OLOANS** to act on behalf of D.C. with respect to the mortgage on 801 Krebs Lane. D.C. did not send such correspondence nor was he aware of such.

119.    On October 4, 2017, Wells Fargo responded to the request, with a letter addressed to D.C. at Post Office Box 515, Allenhurst, Georgia 31301, which was opened by **FRYAR**, the seller of 801 Krebs Lane.   Wells Fargo indicated that **OLOANS** had been added to the mortgage account and was authorized to receive account information and make limited updates.

120.    On or about November 9, 2017, Wells Fargo notified D.C. by mail at Post Office Box 515, Allenhurst, Georgia 31301, that mortgage payments were delinquent.

121.    The Defendants began the process of a loan modification at that time.

122.    On or about March 30, 2018, Wells Fargo granted that modification based on the purported financial hardship of D.C., when in truth and in fact, D.C. did not request such modification.

All in violation of Title 18, United States Code, Sections 1344(2) and 2.

## COUNT THREE
### *Bank Fraud*
### 18 U.S.C. §§ 1344(2) and 2

123.    The Grand Jury realleges and incorporates by reference Paragraphs 1 through 50 and Paragraphs 86 through 106 above in their entirety as if fully set forth herein.

124.    Beginning in or about December 2013 and continuing until on or about October 18, 2021, in Liberty County, within the Southern District of Georgia, and elsewhere, the Defendants,

**ANTHONY OLOANS,**

**JOSEPH FRYAR,**

**DENNIS NOSTRANT, and**

**DAVID REIP**

aided and abetted by each other and by others known and unknown to the Grand Jury, did knowingly execute a scheme and artifice to defraud, and obtain money and property, owned by, or under the custody or control of Wells Fargo, a financial institution, the deposits of which were then insured by the Federal Deposit Insurance Company, by means of false and fraudulent pretenses, representations, and promises relating to a material fact.

### Execution of the Scheme and Artifice

125.    The scheme and artifice to defraud is described above in Paragraphs 86-106, relating to 801 Krebs Lane, Hinesville, Georgia, with such paragraphs incorporated by as if fully set forth herein.

21

126.    Prior to October 4, 2017, Wells Fargo received a written request to allow **OLOANS** to act on behalf of D.C. with respect to the mortgage on 801 Krebs Lane. D.C. did not send such correspondence nor was he aware of this fact.

127.    On October 4, 2017, Wells Fargo responded to the request, with a letter addressed to D.C. at Post Office Box 515, Allenhurst, Georgia 31301, which was opened by **FRYAR**, the seller of 801 Krebs Lane.  Wells Fargo advised that **OLOANS** had been added to the mortgage account and was authorized to receive account information and make limited updates.

128.    On or about November 9, 2017, Wells Fargo notified D.C. by mail at Post Office Box 515, Allenhurst, Georgia 31301, that mortgage payments were delinquent.

129.    The Defendants began the process of a loan modification at that time.

130.    On or about September 17, 2019, Wells Fargo granted that modification based on the purported financial hardship of D.C., when in truth and in fact, D.C. did not request such modification.

All in violation of Title 18, United States Code, Sections 1344(2) and 2.

22

## THE FRAUDULENT VETERANS AFFAIRS EDUCATION BENEFITS SCHEME AGAINST THE VA AND VETERANS

### VA EDUCATION BENFITS BACKGROUND

#### The Entities

131.   The United State Department of Veteran Affairs (hereinafter "VA") was responsible for the administration of VA education benefits to qualifying persons.

132.   The VA established in each state a State Approving Agency to oversee the administration of VA education benefits in that state.  The Georgia Department of Veterans Services (hereinafter "GDVS") was the state approving agency for the State of Georgia.

133.   The Georgia Nonpublic Postsecondary Education Commission (hereinafter "GNPEC") was the entity, that authorized and regulated the operations of all nonpublic (i.e., private) postsecondary educational institutions in the State of Georgia.

#### Education Benefits Under the Department of Veterans Affairs

134.   Under Title 38, United States Code, Chapter 33 - the "Post-9/11 GI Bill"- the VA provided educational assistance to individuals who entered into military service or actively served in the military after September 11, 2001, and who otherwise qualified for assistance based upon their length of service, the nature of their discharge, and other service-related factors.

135.   Under Title 38, United States Code, Chapter 35 – the "Survivors' and Dependents' Educational Assistance Program" – the VA provided educational assistance to dependents of veterans who have a service-connected permanent and

23

total disability or died as a result of service connection.  Generally, eligible persons can receive assistance under this program for up to 45 months, depending on the date s/he elects to use the benefit.

136.   Under Title 38, United States Code, Chapter 30 – the "Montgomery GI Bill" – the VA provided educational assistance to help aid members of the Armed Forces readjust to civilian life after their separation from military service.  Generally, the Montgomery GI Bill applied to individuals who entered into military service or actively served in the military after June 30, 1985, had their pay reduced $100 a month for 12 months, and received an honorable discharge.  Under this program, eligible Servicemembers may receive up to 36 months of education benefits.

137.   Under Title 10, United States Code, Chapter 1606 – the "Montgomery GI Selected Reserve" – the VA provided educational assistance to eligible members of the Selected Reserve, including the Army, Navy, Air Force, Marine Corps, and Coast Guard Reserve, and the Army or Air National Guard.  Generally, eligible persons can receive assistance under this program for up to 36 months.

138.   The VA paid education benefits to the HOPBS under the above-described chapters.

139.   For those receiving Post-9/11 benefits, the VA paid tuition and fees directly to HOPBS.  The VA also paid a housing allowance and a books & supplies fee to the veteran if s/he was enrolled full-time at the HOPBS.

140.   For those receiving benefits under Survivors and Dependents Educational Assistance Program, the Montgomery GI Bill, or the Montgomery GI

24

Selected Reserve, the VA paid the tuition and fees directly to the veteran, who was then responsible for paying HOPBS.

141.    With respect to the Post-9/11 GI Bill benefits, which were paid directly to HOPBS, HOPBS was required to designate a School Certifying Official ("SCO"), who certified the enrollment status of student veterans to the GDVS.

142.    The SCO was required to complete a Form 22-1999, "VA Enrollment Certification" (hereinafter "Form 22-1999") for each veteran student who received a VA education benefit.    Using Form 22-1999, the SCO would certify the course in which the veteran was enrolled, the enrollment period, the number of hours per week the veteran attended the class, and the cost of tuition.    Submission of Form 22-1999 by an SCO triggered payment by the VA to HOPBS.

### Approval Process for HOPBS to Receive
### VA Education Benefits in the State of Georgia

*Step 1: A Religious Exemption*

143.    The GNPEC determines whether a nonpublic postsecondary educational institution offering non-accredited, college degree (hereinafter "NCD") programs may operate in Georgia.

144.    One exemption to an "authorization to operate" is for an institution to qualify for a religious exemption.

145.    For a religious exemption, the entity must show that its "purposes are solely to provide programs of study in theology, divinity, religious education, and ministerial training, and that they do not grant postsecondary degrees of a nonreligious nature and that such institutions: (A) Accept no federal or state funds;

25

and (B) Accept no student who has a federal or state education loan to attend such institutions." Official Code of Georgia Annotated § 20-3-250.3.

*Step 2: Application To GDVS*

146.   If a nonpublic postsecondary educational institution offering NCD programs receives a religious exemption from the GNPEC, it may apply to the GDVS to receive federal funds in the form of VA Education benefits.

147.   Proof of the religious exemption is provided by the GNPEC directly to the institution.

148.   The institution is responsible for applying to GDVS and providing the proof of the exemption to the GDVS.

*Step 3: Annual Certification to GNPEC*

149.   Any institution relying upon a religious exemption to operate in Georgia as a nonpublic postsecondary educational institution offering NCD programs must demonstrate annually that it continues to meet all the requirements for the religious exemption, including that it accepts no federal funds.

**Payment of VA Benefits**

150.   VA-ONCE is a web-based system with servers based in Pennsylvania that allowed an SCO to create and transfer information directly to a VA Regional Office for processing. The VA-ONCE system required the SCO to provide a username and password to access the system and transmit data to the VA. Each SCO had a unique username and password which allowed him to access the system.

26

## The Bank Accounts

151.   HOPCC maintained a bank account at SunTrust bearing an account number ending in 0040.  The Signatories on this account were **LABAT**, **NOSTRANT**, and another co-conspirator.  VA funds were deposited into this account between January 2013 and June 2020.

152.   HOPCC maintained a bank account at First Citizens Bank & Trust Company ending in 2757.  The Signatories on this account were **LABAT** and **NOSTRANT**.  VA funds were deposited into this account between October 2020 and June 2022.

153.   HOPCC maintained a bank account at First Horizon Bank ending in 4595.  The Signatories on this account were **LABAT** and **NOSTRANT**.  VA funds were deposited into this account between September 2020 and March 2022.

154.   HOPCC maintained a bank account at Bank of America ending in 4538.  The Signatories on this account were **LABAT** and **NOSTRANT**.  VA funds were deposited into this account between February 2020 and October 2020.

27

## COUNT FOUR
*Conspiracy to Commit Wire Fraud*
18 U.S.C. §§ 1343 and 1349

155.   Paragraphs 1 through 31 and 131 through 155 of this Indictment are hereby realleged and incorporated herein as though set forth fully herein.

156.   Beginning on a date unknown to the Grand Jury, but by no later than December 27, 2011, and continuing through on or about January 17, 2022, in the Southern District of Georgia, and elsewhere, the Defendants,

**FNU LNU aka RONY DENIS,**

**OMAR GARCIA,**

**MARCUS LABAT**, and

**GERARD ROBERTSON**

and other conspirators known and unknown, did knowingly and willfully combine, conspire, confederate and agree with each other and with others known and unknown to the Grand Jury, and with intent to defraud, devise and intend to devise a scheme and artifice to defraud the VA and various veterans and to obtain money and property from the VA and various veterans by means of materially false and fraudulent pretenses, representations, and promises, knowing that the pretenses, representations, and promises were false and fraudulent when made, and did knowingly transmit and cause to be transmitted in interstate commerce, by means of wire communication, certain writings, signs, signals, pictures and sounds, for the purpose of executing and attempting to execute the scheme and artifice.

28

Object of the Conspiracy

157.    The object of the scheme and artifice to defraud was for the Defendants and their co-conspirators to unlawfully enrich themselves by defrauding the VA and veterans and receiving VA funds to which they were not entitled to receive.

Manner and Means

158.    The manner and means utilized by the Defendants to accomplish the object of the scheme and artifice to defraud included, but were not limited to, the following:

*The Veterans*

159.    **DENIS** and other members of the conspiracy directed veterans who were members of the HOPCC to attend HOPBS.

160.    HOPBS would often exhaust veteran-students' VA Education benefits at the bible seminary.

161.    The veteran-student would rarely, if ever, graduate from HOPBS's course of study.

*Receipt of VA Benefits*

162.    On or about December 27, 2011, **ROBERTSON**, the "President" and Director" of the HOPBS in Hinesville, Georgia, applied to the GNPEC for a religious exemption on behalf of the HOPBS.

163.    On or about January 10, 2012, the GNPEC approved the religious exemption for HOPBS and provided a letter to **ROBERTSON** as proof of the exemption. The letter specifically directed **ROBERTSON** that the HOPBS would be

29

expected to certify annually that the HOPBS continued to meet all the requirements making it eligible for religious exemption, including that HOPBS *does not receive any federal funds.*

164.    On or about February 29, 2012, HOPBS "Registrar" **GARCIA**, submitted an Application for Update of Approval for VA Benefits to GDVS. On that same day, **ROBERTSON**, submitted to GDVS a "graduation list" from HOPBS for the years 2009, 2010 and 2011. The list of graduates was, at least in part, false.

165.    On or about October 2, 2012, the GDVS approved HOPBS to receive VA education benefits based, in part, on HOPBS meeting the requirements for a religious exemption, as determined by the GNPEC. One of the requirements pursuant to law is that the HOPBS *was not receiving any federal funds*, which included VA education benefits.

166.    Once HOPBS received the religious exemption from GNPEC and used that to receive authority to request VA Education benefits, GDVS required that HOPBS designate one or more SCOs. The SCO was responsible for completing VA Form 22-1999, the VA Enrollment Certification, for each veteran who would receive VA tuition assistance funds. Using such forms, SCOs certified the course in which the veteran was enrolled, the start and end dates of the enrollment period, the number of hours per week the veteran attended class, and the cost of tuition for the course.

167.    In or about 2013, HOPBS submitted to GDVS its first Form 22-1999 requesting payment for federal education benefits from GDVS.

168. Beginning in or about January 2013, federal funds in the form of VA education benefits were deposited into accounts under the ownership and control of HOPCC and HOPBS. The receipt of these federal education benefit funds rendered HOPBS ineligible for the religious exemption granted by the GNPEC in or about January 2012. Consequently, HOPBS became ineligible to receive VA education benefits as a result of not being religiously exempted in or about January 2013.

169. Each year after in or about 2013 up to 2021, HOPBS through its agents and officers falsely certified that it did not receive any federal funds.

170. On or about December 28, 2015, **GARCIA** falsely certified to GNPEC that HOPBS had not received any federal funds in the calendar year of 2015, when in truth and in fact, in or about 2015, the VA paid to the HOPBS a total of $561,814.

171. On or about March 16, 2017, **GARCIA** falsely certified to GNPEC that HOPBS had not received any federal funds in the calendar year of 2016, when in truth and in fact, in 2016, the VA paid to the HOPBS a total of $652,465.

172. On or about December 11, 2017, **GARCIA** falsely certified to GNPEC that HOPBS had not received any federal funds in the calendar year of 2017, when in truth and in fact, in or about 2017, the VA paid to the HOPBS a total of $669,774.

173. On or about November 28, 2018, **GARCIA** falsely certified to GNPEC that HOPBS had not received any federal funds in the calendar year of 2018, when in truth and in fact, in or about 2018, the VA paid to the HOPBS a total of $521,730.

31

174.    On or about January 18, 2020, **GARCIA** falsely certified to GNPEC that HOPBS had not received any federal funds in the calendar year of 2019, when in truth and in fact, in or about 2019, the VA paid to the HOPBS a total of $450,015.

175.    On or about November 27, 2020, **GARCIA** falsely certified to GNPEC that HOPBS had not received any federal funds in the calendar year of 2020, when in truth and in fact, in or about 2020, the VA paid to the HOPBS a total of $284,058.

176.    On or about November 5, 2021, **GARCIA** falsely certified to GNPEC that HOPBS had not received any federal funds in the calendar year of 2021, when in truth and in fact, in or about 2021, the VA paid to the HOPBS a total of $125,262.

177.    If the VA had been aware of the fraudulent certifications relating to the Georgia facilities in Hinesville and Hephzibah, it would not have authorized operations in the remaining three seminaries.

178.    Accordingly, the Defendants defrauded the VA into paying education benefits both directly to HOPBSs in Georgia, North Carolina, Texas, and Washington and for housing, fees, book, and tuition payment to veterans which would have not been paid.  Between in or about and between 2013 and 2022, the VA was defrauded into paying federal education benefits exceeding $23,500,000.

179.    These education benefit funds went to enrich the Defendants.

All in violation of Title 18 United States Code, Sections 1343 and 1349.

32

## COUNTS FIVE THROUGH TWENTY-THREE
### *Wire Fraud*
18 U.S.C. §§ 1343 and 2

180.    Paragraphs 1 through 31 and 131 through 179 of the Indictment are realleged and incorporated herein by reference.

181.    On or about the dates listed below, in the Southern District of Georgia, and elsewhere, for the purpose of executing the above-described scheme and artifice to defraud described in Count Four of this Indictment, the Defendants identified below, aided and abetted each other and others known and unknown to the Grand Jury, knowingly transmitted and caused to be transmitted, in interstate commerce by means of wire communications certain signs, signals, and sounds, each such transmittal constituting a separate count of this Indictment, as follows:

| Count | Defendant(s) | Approximate Date | Description Of Wire |
|---|---|---|---|
| 5 | **OMAR GARCIA** | March 1, 2021 | Submission of VA form 22-1999 through the VA-ONCE portal for veteran R. P. |
| 6 | **OMAR GARCIA** | March 1, 2021 | Submission of VA form 22-1999 through the VA-ONCE portal for veteran L.R. |
| 7 | **OMAR GARCIA** | March 1, 2021 | Submission of VA form 22-1999 through the VA-ONCE portal for veteran N.D.P. |
| 8 | **MARCUS LABAT** | June 7, 2021 | Submission of VA form 22-1999 through the VA-ONCE portal for veteran F. A.O. |
| 9 | **MARCUS LABAT** | September 7, 2021 | Submission of VA form 22-1999 through the VA-ONCE portal for veteran J.O.-P. |
| 10 | **MARCUS LABAT** | January 4, 2022 | Submission of VA form 22-1999 through the VA-ONCE portal for veteran L.A.R.-D. |

33

| Count | Defendant(s) | Approximate Date | Description Of Wire |
|---|---|---|---|
| 11 | MARCUS LABAT | January 4, 2022 | Submission of VA form 22-1999 through the VA-ONCE portal for veteran H.P.L. |
| 12 | MARCUS LABAT | January 4, 2022 | Submission of VA form 22-1999 through the VA-ONCE portal for veteran M.L. |
| 13 | MARCUS LABAT | January 4, 2022 | Submission of VA form 22-1999 through the VA-ONCE portal for veteran R.P.M. |
| 14 | MARCUS LABAT | January 4, 2022 | Submission of VA form 22-1999 through the VA-ONCE portal for veteran C.D.B |
| 15 | MARCUS LABAT | January 4, 2022 | Submission of VA form 22-1999 through the VA-ONCE portal for veteran J.M.A. |
| 16 | MARCUS LABAT | January 4, 2022 | Submission of VA form 22-1999 through the VA-ONCE portal for veteran L.D.H. |
| 17 | MARCUS LABAT | January 4, 2022 | Submission of VA form 22-1999 through the VA-ONCE portal for veteran K.R. |
| 18 | MARCUS LABAT | January 4, 2022 | Submission of VA form 22-1999 through the VA-ONCE portal for veteran J.I.N. |
| 19 | MARCUS LABAT | January 4, 2022 | Submission of VA form 22-1999 through the VA-ONCE portal for veteran C.R. |
| 20 | MARCUS LABAT | January 4, 2022 | Submission of VA form 22-1999 through the VA-ONCE portal for veteran F.A.O. |
| 21 | MARCUS LABAT | January 4, 2022 | Submission of VA form 22-1999 through the VA-ONCE portal for veteran D.J.R. |
| 22 | MARCUS LABAT | January 4, 2022 | Submission of VA form 22-1999 through the VA-ONCE portal for veteran E.D.S. |
| 23 | MARCUS LABAT | January 5, 2022 | Submission of VA form 22-1999 through the VA-ONCE portal for veteran R.A.G. |

All in violation of Title 18, United States Code, Sections 1343 and 2.

34

## COUNT TWENTY-FOUR
*Aiding and Assisting in the Filing of a False Tax Return*
26 U.S.C. § 7206(2)

182.   Paragraphs 1 through 4 of this Indictment are re-alleged and incorporated by reference as though fully set forth herein.

183.   On or about October 16, 2019, in the Southern District of Georgia and elsewhere Defendant,

### FNU LNU aka "RONY DENIS"

willfully aided and assisted in, and procured, counseled, and advised on the preparation and presentation to the Internal Revenue Service of a joint U.S. Individual Income Tax Return, Form 1040, for **FNU LNU aka "RONY DENIS"** and his spouse for calendar year 2018, which was false and fraudulent as to material matters, including, but not limited to, line 6, stating a total income of $165,601, whereas, as **FNU LNU aka "RONY DENIS"** then and there well knew and believed that those items, as reported, were false.

All in violation of Title 26, United States Code, Section 7206(2).

35

## COUNT TWENTY-FIVE
*Aiding and Assisting in the Filing of a False Tax Return*
26 U.S.C. § 7206(2)

184.   Paragraphs 1 through 4 of this Indictment are re-alleged and incorporated by reference as though fully set forth herein.

185.   On or about October 21, 2020, in the Southern District of Georgia and elsewhere Defendant,

### FNU LNU aka "RONY DENIS"

willfully aided and assisted in, and procured, counseled, and advised on the preparation and presentation to the Internal Revenue Service of a joint U.S. Individual Income Tax Return, Form 1040, for **FNU LNU aka "RONY DENIS"** and his spouse for calendar year 2019, which was false and fraudulent as to material matters, including, but not limited to, line 7b, stating a total income of $155,408, whereas, as **FNU LNU aka "RONY DENIS"** then and there well knew and believed that those items, as reported, were false.

All in violation of Title 26, United States Code, Section 7206(2).

36

## COUNT TWENTY-SIX
*Aiding and Assisting in the Filing of a False Tax Return*
26 U.S.C. § 7206(2)

186.   Paragraphs 1 through 4 of this Indictment are re-alleged and incorporated by reference as though fully set forth herein.

187.   On or about September 28, 2021, in the Southern District of Georgia and elsewhere Defendant,

### FNU LNU aka "RONY DENIS"

willfully aided and assisted in, and procured, counseled, and advised on the preparation and presentation to the Internal Revenue Service of a joint U.S. Individual Income Tax Return, Form 1040, for **FNU LNU aka "RONY DENIS"** and his spouse for calendar year 2020, which was false and fraudulent as to material matters, including, but not limited to, line 9, stating a total income of $247,433, whereas, as **FNU LNU aka "RONY DENIS"** then and there well knew and believed that those items, as reported, were false.

All in violation of Title 26, United States Code, Section 7206(2).

## FORFEITURE ALLEGATION

The allegations contained in Counts One through Twenty-Three of this Indictment are hereby re-alleged and incorporated by reference for the purpose of alleging forfeitures pursuant to Title 18, United States Code, Sections 981(a)(1)(C) and 982(a)(2), and Title 28, United States Code, Section 2461(c).

Upon conviction of one or more of the offenses set forth in Counts One through Twenty-Three of this Indictment, Defendants shall forfeit to the United States of America, pursuant to Title 18, United States Code, Sections 981(a)(1)(C) and 982(a)(2), and Title 28, United States Code, Section 2461(c), any property constituting, or derived from, proceeds obtained, directly or indirectly, as a result of such violation, including but not limited to a money judgment in an amount to be determined by the Court at sentencing.

If any of the property described above, as a result of any act or commission of the Defendant:

    a.   cannot be located upon the exercise of due diligence;

    b.   has been transferred or sold to, or deposited with, a third party;

    c.   has been placed beyond the jurisdiction of the court;

    d.   has been substantially diminished in value; or

    e.   has been commingled with other property which cannot be divided without difficulty,

the United States of America shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c).

A True Bill

Foreperson

Margaret E. Heap
United States Attorney

Patricia G. Rhodes
Assistant United States Attorney
*Co-lead Counsel

Tania D. Groover
Assistant United States Attorney
Chief, Criminal Division

George J.C. Jacobs, III
Assistant United States Attorney
*Co-lead Counsel

39

# Indictment, Information, Complaint

## 1:25-cr-00062-JRH-BKE *SEALED* USA v. SEALED

### U.S. District Court

### Southern District of Georgia

## Notice of Electronic Filing

The following transaction was entered on 9/5/2025 at 3:30 PM EDT and filed on 9/4/2025

**Case Name:** USA v. SEALED

**Case Number:** 1:25-cr-00062-JRH-BKE *SEALED*

**Filer:**

**Document Number:** 3(No document attached)

## Docket Text:

**SEALED INDICTMENT as to Sealed Defendant 1 - 125cr62 (1) count(s) 1, 4, 24-26, Sealed Defendant 2 - 125cr62 (2) count(s) 1, 2-3, Sealed Defendant 3 - 125cr62 (3) count(s) 1, 2-3, Sealed Defendant 4 - 125cr62 (4) count(s) 1, 2-3, Sealed Defendant 5 - 125cr62 (5) count(s) 1, 4, Sealed Defendant 6 - 125cr62 (6) count(s) 1, 2-3, Sealed Defendant 7 - 125cr62 (7) count(s) 4, 8-23, Sealed Defendant 8 - 125cr62 (8) count(s) 4, 5-7. (pts)**

**1:25-cr-00062-JRH-BKE *SEALED*-1** No electronic public notice will be sent because the case/entry is sealed.

**1:25-cr-00062-JRH-BKE *SEALED*-2** No electronic public notice will be sent because the case/entry is sealed.

**1:25-cr-00062-JRH-BKE *SEALED*-3** No electronic public notice will be sent because the case/entry is sealed.

**1:25-cr-00062-JRH-BKE *SEALED*-4** No electronic public notice will be sent because the case/entry is sealed.

**1:25-cr-00062-JRH-BKE *SEALED*-5** No electronic public notice will be sent because the case/entry is sealed.

**1:25-cr-00062-JRH-BKE *SEALED*-6** No electronic public notice will be sent because the case/entry is sealed.

**1:25-cr-00062-JRH-BKE \*SEALED\*-7** No electronic public notice will be sent because the case/entry is sealed.

**1:25-cr-00062-JRH-BKE \*SEALED\*-8** No electronic public notice will be sent because the case/entry is sealed.